74 N.J. Super. 520 (1962)
181 A.2d 560
THE STATE OF NEW JERSEY, PLAINTIFF,
v.
FRANK ROMEO, DEFENDANT.
Superior Court of New Jersey, Essex County Court, Law Division  Criminal.
Decided May 23, 1962.
*521 Mr. Thomas P. Ford, Jr., Assistant Prosecutor, appeared for plaintiff (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney).
Mr. Thomas E. Durkin, Jr., appeared for defendant.
YANCEY, J.C.C.
This is a motion to strike two outstanding indictments and to have a judgment of acquittal entered on behalf of the defendant, Frank Romeo. The motion is made pursuant to R.R. 3:5-5(a), which supersedes the former practice of asserting by written plea the defense of autrefois acquit. See State v. Boening, 63 N.J. Super. 588 (App. Div. 1960).
The indictments were returned on February 14, 1961. Indictment No. 1042 charges Frank Romeo, together with others, with conspiracy to violate the gambling laws in violation of N.J.S. 2A:98-1. Indictment No. 1045 charges him with what is commonly referred to as bookmaking in violation of N.J.S. 2A:112-3. No motions were addressed by the defendant attacking the validity of the indictments, and the court accepted a plea of not guilty to both indictments.
The matter came on for trial on February 26, 1962, before this court. A jury was selected after a proper voir dire, and said jury was sworn. At the time of the impanelling each juror was asked by both the assistant prosecutor *522 and defense counsel whether he or she was acquainted with the defendant, Frank Romeo. None acknowledged any such acquaintance.
Successive opening statements were made by the assistant prosecutor and by defense counsel. Testimony was then taken from the first two witnesses called by the State. Their entire testimony, including all cross-examination, was completed. The court then recessed for the day, with the usual instructions to the jury admonishing them not to speak to anyone about the trial.
On February 27, 1962, on what was supposed to have been the second day of trial and a continuation of the State's case, juror No. 1 advised the court that upon reaching home after the first day of trial, he had inquired of his wife whether or not he in fact knew Frank Romeo. Later that same evening he telephoned his brother-in-law and asked the same question. It appears that the juror himself did not know the defendant personally, but his brother-in-law was acquainted with the defendant and informed the juror that they were all members of a common local social organization.
The court then advised both the State and the defense counsel of its conversation with the juror in court, to the exclusion of the remainder of the jurors. It then inquired whether or not both parties would consent to the continuance of the trial with 11 jurors if it became necessary to remove juror No. 1 from further participation in the trial. The defense counsel agreed to stipulate in writing to less than 12 jurors under R.R. 3:7-1(b), but the assistant prosecutor refused.
Juror No. 1 was then interrogated in open court by the court, assistant prosecutor and defense counsel. At the termination of this supplemental voir dire, the court reserved decision. The court then inquired of counsel whether there were to be any motions made as a result of the testimony given by juror No. 1. No motions were made, but the prosecutor said:
*523 Mr. Ford: "If your Honor please, based upon the facts as they have been adduced from this particular witness, I feel that the Court should within its discretion grant a motion for mistrial at this time."
The court then decided that juror No. 1's actions required his being removed from further service in the case. The defense then moved that the trial continue with 11 jurors pursuant to R.R. 3:7-1(b). Upon being asked by the court what the position of the State was in regard to continuing the trial with 11 jurors, the prosecutor responded:
Mr. Ford: "Your Honor, I will be glad to state the position of the State. Your Honor has, I believe, the record of his statement and he has excused Juror No. 1, the foreman, with no other choice. I am aware of that, your Honor. The State does not at this time and will not at this time stipulate in writing as provided by the Rule 3:7-1 to proceed with 11 jurors."
Mr. Durkin: "That is sufficient for the perfunctory feature of it, anyhow."
The court then pointed out to the prosecutor the holding of State v. Locklear, 16 N.J. 232 (1954), and upon the refusal of the prosecutor to continue with 11 jurors, the court, lacking any further discretion in the matter, was compelled by the refusal to grant a mistrial:
Judge Yancey: "Under the circumstances, I have no alternative, much as I dislike doing it, but to declare a mistrial and I shall do so. I wish you [the prosecutor] could have gone along with 11 jurors, but I cannot compel counsel to do so."
Thus, to distill the facts, the trial resulted in a breach consisting of (1) testimony received before a duly constituted jury, (2) the removal of one juror, (3) refusal of the State to continue with 11 jurors, (4) the defense motion to continue with 11 jurors pursuant to R.R. 3:7-1(b), (5) the State's refusal to move for mistrial, but its strong prompting of the court to do so on its own, and finally, *524 (6) the court, strongly favoring a continuation of the trial, nevertheless declared a mistrial on its own motion.
The defense contends that it was unreasonable for the State not to consent to continue the trial with the remaining 11 jurors under R.R. 3:7-1(b):
"Juries shall be of 12 persons but at any time before verdict the parties may stipulate in writing with the approval of the court that the jury shall consist of any number less than 12, except in murder cases." (Emphasis added)
It further argues that since the State would not stipulate to R.R. 3:7-1(b) and did not present a legally sufficient reason for its refusal, this per se was the only reason for the mistrial. Since the trial placed defendant in jeopardy and it resulted in a mistrial through no fault of his own and against his endeavors, said mistrial, as a matter of law, is equivalent to an acquittal, ergo, a second trial grounded on the same indictments would place the defendant in double jeopardy. The defendant therefore moves the motion to strike the outstanding indictments and be awarded a judgment of acquittal. To reach this conclusion, the defense relies upon the general rule that when a person has been placed on trial on a valid indictment or accusation before a court of competent jurisdiction, has been arraigned and pleaded and a jury impanelled and sworn, he is in jeopardy. It relies heavily upon the law set forth in State v. Locklear, supra:
"There seems to be abundant authority that, if the jury is discharged without the accused's consent for a reason legally insufficient and without an absolute necessity for it, the discharge is, as a matter of law, an acquittal.
All of the authorities agree that, after some evidence in support of the accusation is submitted to the jury, the discharge of the jury without a legally sufficient reason for doing it, amounts to an acquittal of the prisoner.
If the jury is discharged for a reason legally insufficient and without an absolute necessity for it and without the defendant's consent, *525 the discharge is equivalent to an acquittal and may be pleaded as a bar to any further trial or to any subsequent indictment."
If the defense's position is correct, the State could never arbitrarily invoke R.R. 3:7-1(b) without additional reasons and explanations. Defendant concedes that the court was compelled to declare a mistrial, but it contends that it would not have been an absolute necessity had it not been for the State's arbitrary position to exert its right under the rule without a legally sufficient reason.
The defendant concludes its argument for the motion with the reasoning that the State was not elated with the testimony of its witnesses who had already testified and that it pounced upon the opportunity to pilot a mistrial once the jury was reduced to 11 members. It again braces this conclusion with the Locklear case, page 236:
"This `absolute necessity' rule has been followed in other jurisdictions, and the reasons supporting it are obvious. Some cases speak of the possibility for abuse and oppression, if the prosecutor can rid himself of a jury merely because of his dislike for it or for some of its members or because of the possibility that the defendant might be less prepared at a future day, or even because of a desire unnecessarily to harass the defendant. People v. Barrett, 2 Caines, N.Y. 304, 2 Am. Dec. 239 (1805)."
The State, on the other hand, argues that R.R. 3:7-1(b) is concise and clear, and does not require the party refusing to sign and consent to give any reasons for his refusal. It does not argue with the cases cited by the defense, especially Locklear, but takes the position that the facts of these cases are not in any way related to the factual situation presented here. In the trial of Locklear the prosecutor moved for mistrial after 19 full trial days on grounds that it discovered new evidence which had been willfully suppressed. On appeal, our Supreme Court declared that upon the return of a new indictment the defendant's plea of autrefois acquit should be sustained. Here the court, in coming to its decision, said that the discovery of new evidence was not *526 such an "impossibility" as not to proceed with the trial and that such circumstances did not create an absolute or an overriding necessity, nor did they constitute "sufficient legal reason" for a mistrial as required by many cases.
State v. Preto, 51 N.J. Super. 175 (Law Div. 1958), held that the granting of a mistrial and subsequent indictment for the same offense amounted to double jeopardy. There, one member of the impanelled jury was the mother of a client of the defense counsel and new evidence was discovered. The court held that these were not compelling or necessary reasons for declaring a mistrial; as a result, double jeopardy arose.
Though the Locklear and Preto cases are not in point factually, their principles of law are binding here and, as the State argues, are more in its favor than the defendant's. The exercise of one's rights under the Supreme Court rules is, in and of itself, a "reason legally sufficient" to satisfy the Locklear rule. The Supreme Court unquestionably has the power to develop and issue rules regarding trial procedure. This was made clear by Winberry v. Salisbury, 5 N.J. 240, 255 (1950). All parties to this action, including the court, were religiously bound by the provision of R.R. 3:7-1(b). It cannot be held that a valid exercise of this rule by the State, specifically created to cover a particular situation, can be held to be capricious or arbitrary; nor could the court have coerced the State or any party into taking another course under the rule. The situation itself, created by factual developments during the trial, caused the mistrial, and not the sole act of one of the parties. The court has no authority to speculate or entertain reasons for the parties maneuvering under this rule.
This situation is undoubtedly one of the many circumstances that the United States Supreme Court had in mind in Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), when it held:
*527 "A trial may be discontinued when particular circumstances manifest a necessity for so doing and when failure to discontinue would defeat the ends of justice."
R.R. 3:7-1(b), like all other rules, was designed to promote justice and is not to be used to utterly subvert and defeat it.
The defendant's motion is denied.