OSVALDO ORTIZ BÁEZ, peticionario, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE PONCE, HON. EDWIN MELÉNDEZ GRILLASCA, JUEZ, demandado; EL PUEBLO DE PUERTO RICO, interventor.

*Número:* O-67-140        *Resuelto:* 26 de enero de 1970

*Efraín Goglas Carvajal,* abogado del peticionario; *J. B. Fernández Badillo, Procurador General,* y *Lolita Miranda, Procuradora General Auxiliar,* abogados del interventor.

EL JUEZ ASOCIADO SEÑOR RAMÍREZ BAGES emitió la opinión del Tribunal.

La cuestión a determinar en este recurso es si constituye una doble exposición bajo la Regla 64(e) (¹) de las de Procedimiento Criminal, la celebración de una segunda vista ante otro jurado de una acusación de hurto debido a que el tribunal de instancia ante el cual se celebraba la primera vista (1) permitió una enmienda de la acusación, luego de desfilar la prueba de la defensa, con el fin de eliminar una incongruencia entre las alegaciones y la prueba, de manera que, en vez de imputar el hurto de piezas de un automóvil se hiciera constar que el peticionario hurtó dicho vehículo, y, (2) con el consentimiento del peticionario, pospuso el juicio para celebrarlo ante otro jurado de acuerdo a la Regla 38(d) (²) de las de Procedimiento Criminal.

---

(¹) La Regla 64(e) dispone que:

"La moción para desestimar la acusación o la denuncia, o cualquier cargo de las mismas, sólo podrá basarse en uno o más de los siguientes fundamentos:

". . . . . . . .

"(e) Que el acusado ha sido convicto, *o ha estado expuesto a serlo,* o ha sido absuelto del delito que se le imputa. Si la moción para desestimar se basare en este fundamento, la misma expresará el nombre bajo el cual el acusado fue convicto, expuesto a convicción o absuelto, y la fecha, tribunal y lugar de convicción, exposición o absolución. La moción para desestimar podrá presentarse por cualquier acusado que hubiere sido absuelto por los méritos del caso, no obstante haber existido cualquier defecto en la acusación o denuncia." (Énfasis nuestro.)

(²) La Regla 38(d) dispone que:

". . . . . . . .

"(d) Incongruencia entre las alegaciones y la prueba. *El tribunal podrá permitir enmiendas a la acusación,* a la denuncia o a un escrito de especificaciones en cualquier momento antes de la convicción o absolución

Creemos que bajo tales circunstancias, no debe prosperar la defensa de doble exposición.

A los efectos de un mejor entendimiento de la cuestión planteada, se hace necesario hacer un resumen de la prueba aducida por las partes y de los incidentes subsiguientes.

En el caso de *Pueblo* v. *Osvaldo Ortiz Báez*, Criminal G-66-103, comenzó el juicio en 9 de noviembre de 1966, en el Tribunal Superior, Sala de Ponce. Se acusó entonces al ahora peticionario del hurto de varias piezas valoradas en más de $100 del automóvil del Sr. Eligio López Rivera.

El ministerio público expuso su teoría del caso al jurado y les dijo que trataría de probarles que el 10 de enero de 1966 Eligio López Rivera llegó al Barrio Pulguillas de Coamo en su automóvil o que estaba a nombre suyo y lo dejó estacionado frente a la residencia de una tía suya; que al otro día por la mañana el automóvil había desaparecido del lugar; que se querelló a la policía y luego el vehículo apareció en el Barrio Matón de Cayey desmantelado de sus piezas y quemado; que las piezas del carro posteriormente se vendieron por el acusado y otro más a distintas personas; que las piezas vendidas fueron sacadas del vehículo y coincidían con las del vehículo que le había sido hurtado a Eligio López.

El primer testigo del Pueblo fue Clotilde López Rodríguez. Declaró que era residente del Barrio Pulguillas de Coamo; que Eligio López era su hijo y ahora se encontraba en Vietnam; que para el 12 de enero de 1966 su hijo tenía

---

del acusado, *en caso de que hubiere incongruencia entre estas alegaciones y la prueba.* La incongruencia o desacuerdo entre las alegaciones y la prueba no será fundamento para la absolución del acusado; pero *el tribunal, siempre que el acusado no se opusiere, deberá posponer el juicio si es de opinión que los derechos sustanciales del acusado se han perjudicado, para celebrarlo ante otro jurado* o ante el mismo tribunal si el juicio no fuere por jurado, y según el tribunal determinare.

"Si *la incongruencia o desacuerdo es de tal naturaleza que la prueba estableciere un delito distinto del imputado,* no incluido en éste, o estableciere la comisión de un delito fuera de la competencia del tribunal, *se deberá disolver el jurado y se sobreseerá el proceso."* (Énfasis nuestro.)

un automóvil Chevrolet de 1956 color amarillo y negro comprado por el testigo y que él valoró en $1,500 luego de haberlo reparado; que el vehículo estaba a nombre suyo y lo utilizaba su hijo; que el 11 de enero su hijo vino a su casa y estacionó el vehículo frente a la casa de una tía de él; que esa noche no utilizaron el carro y por la mañana el vehículo no estaba allí. Notificaron al cuartel de la policía de Aibonito ese mismo día. Volvió a ver el vehículo, quemado, el día 14 cuando la policía les notificó que lo habían encontrado en Cayey. Le faltaba el motor, las gomas y la transmisión.

Después de ser contrainterrogado este testigo, y en ausencia del jurado, el ministerio público solicitó que se le permitiera enmendar la acusación para que dispusiera en su lugar "que el vehículo era propiedad del señor Clotilde López Rodríguez, pero bajo la posesión inmediata de su hijo el señor Eligio López Rivera." Se opuso la defensa por entender que la enmienda variaba los elementos del delito y se imputaba entonces un delito distinto. Permitida la enmienda, el tribunal entonces preguntó si había objeción a que se suspendiera el juicio a lo cual contestó la defensa, primeramente, que no tenía objeción pero luego, después de otras consideraciones manifestó que el caso debía continuar y así lo dispuso la Sala.

Acto seguido, se le volvió a leer la acusación en su totalidad al jurado con la enmienda aceptada según transcrita. Continuado el proceso, el fiscal anunció el testimonio de Sergio Vargas Miranda. Por segunda vez la Sala preguntó si "habiéndose emitido la resolución del Tribunal ¿la Defensa no tiene objeción a que continúe el caso?" Expresó la defensa: "no tenemos objeción a que continúe el caso con la salvedad hecha por la defensa." La salvedad era que entendía que la acusación enmendada alegaba un delito distinto.

El Sr. Sergio Vargas Miranda testificó que: era residente del barrio Matón Abajo de Cayey el 11 al 12 de enero de 1966; conocía al acusado y a otra persona llamada Rafael Colón Pagán desde hacía 21 años; el 12 de enero el testigo tenía su automóvil estacionado con el motor en el piso para repararlo y como a las diez de la mañana el acusado y Colón Pagán "ofrecieron venderme el motor de ese carro por la cantidad de $75." El testigo hizo el negocio en presencia de Miguel Ángel Rivera que tenía carro y de un mecánico de nombre José Antonio Rodríguez; éste sacó el motor del carro y lo condujo donde estaba el otro. El vehículo del motor vendido estaba estacionado frente a la casa del acusado Osvaldo Ortiz Báez, tenía capota amarilla, el bonete y la parte de abajo negros, y era del año 1956. El motor comprado lo llevó Miguel Ángel Rivera y lo montó José Antonio Rodríguez. El acusado y Colón Pagán le informaron que el motor era de ellos. Posteriormente declaró el testigo que el acusado y Colón Pagán vendieron las gomas a Andrés Cartagena residente también del barrio. Después llegaron los guardias y le dijeron que el motor no era de ellos, que era hurtado y querían llevarse las piezas. El testigo no tuvo objeción a que se llevaran las piezas y también el carro suyo con el motor montado. Además del motor, le compró al acusado y a Colón Pagán la transmisión y el radiador por los $75. No conocía al dueño del vehículo y dijo que si hubiese sabido que el automóvil era hurtado no hubiera comprado eso.

El contrainterrogatorio del testigo Vargas Miranda iba dirigido a establecer que la persona que verdaderamente hurtó el vehículo en cuestión era el propio Vargas Miranda.

Andrés Cartagena declaró que para enero de 1966 era porteador público entre Cayey y Aibonito; que conocía al acusado, nacidos en el mismo barrio al igual que a Rafael Colón Pagán; que el 11 de enero de 1966 el acusado Ortiz Báez y Colón Pagán fueron a ofrecerle las gomas y a dár-

selas baratas; el testigo aceptó comprarlas y ellos le dijeron que eran de un carro que habían comprado y le vendían las gomas porque necesitaban dinero. Les dio $10 para luego darles $10 más por tres gomas con sus aros, color amarillo; que vio el carro de donde salieron las gomas en una finca de Matón y Rafael Colón lo llevó allí. Ortiz Báez lo estaba esperando. El testigo usó dos gomas en su automóvil y al enterarse más tarde de algo, devolvió las gomas al acusado Ortiz Báez y a Colón Pagán y se comunicó con la policía. El acusado y Colón Pagán le dijeron que no se apurara que podía correr las gomas porque el carro no iba a aparecer.

En contrainterrogatorio Cartagena aceptó que al comprar las gomas, los aros estaban pintados de amarillo y que él los pintó entonces de colorado. Dijo que sabía que el acusado no sabía guiar ni tenía licencia de conducir. Manifestó el testigo que el acusado y su acompañante le habían dicho que no se apurara que ya el carro lo habían desaparecido; que se habían robado el carro en Pulguillas y que se callara que no se iba a saber nada.

José Antonio Rodríguez testificó que el carro de Vargas se le rompió frente a donde vivía el testigo y Vargas le dijo que iba a comprar un motor para ponérselo. El testigo sacó el motor roto. Miguel Ángel Rivera llevó un motor para que el testigo lo montara como lo montó al vehículo de Vargas. No sabe de dónde salió el motor. Repreguntado, negó haber visto transacción sobre este motor con el acusado.

Declaró después el testigo Argimiro Ortiz Vega. Dijo haberle comprado a Eligio López Rivera un motor Chevrolet para un carro suyo de 1956. Montado el motor en su carro, vino la policía a investigar y le encontró el número al motor. Era el 0095767 F 562. Contrainterrogado no pudo decir de memoria el número de su seguro social que lo tenía desde 1950.

El siguiente testigo del Pueblo fue el agente Antonio Espada. Dijo que hizo la investigación de este automóvil

hurtado que apareció desmantelado en el Barrio Matón. Andrés Cartagena informó el caso. El y un detective entrevistaron a Vargas quien les dijo que había comprado el motor a Osvaldo Ortiz Báez incluso la tablilla Núm. 879-008. No interrogó al acusado antes de someter el caso porque se había ido del barrio. Repreguntado dijo que el carro quemado no tenía tablilla. Ésta se la entregó el testigo Sergio Vargas quien "en la búsqueda la encontró y me la entregó." Encontró a Sergio Vargas con las piezas del carro desaparecido en la carretera. Declaró que "a Sergio Vargas nunca se le imputó nada . . . voluntariamente él estaba cooperando en la investigación con nosotros."

Terminada la prueba de cargo, la defensa presentó una moción de absolución del acusado (*non suit*) porque no se identificaron las piezas hurtadas y no se había probado el valor de éstas a los efectos del grado mayor de hurto. El tribunal de instancia declaró sin lugar esta moción por entender que se había establecido que el valor del vehículo identificado ascendía a $1,500 y que "la prueba que hay ante este tribunal es el valor del costo original de ese carro y la reparación y las únicas piezas con valor probado de $95, $75 el motor, tomando eso como cierto, y $20 las gomas."

Resulta evidente que desde el inicio del primer juicio en el caso, se ofreció establecer, dentro del marco de los hechos expuestos en la acusación, el hurto del vehículo Chevrolet perteneciente a Eligio López Rivera pero inscrito a nombre de su padre Clotilde López Rodríguez. Así lo entendió el tribunal de instancia al denegar la moción de absolución.

Por la defensa testificó Miguel Ángel Rivera, testigo renunciado por el fiscal. Declaró que el 13 ó el 14 de enero de 1966, Sergio Vargas Miranda le pidió que le llevara un motor para ponérselo a su carro Chevrolet del 1956; que este vehículo hacía como dos meses que no funcionaba; que el motor lo tenía Vargas enganchado a un árbol cerca de

un carro que le había dicho que había comprado "en el barrio Pulguillas de Aibonito." Que en ningún momento vio transacciones con ese motor entre el acusado y Vargas, ni con Rafael Colón; que el acusado no sabe guiar automóvil; que al otro día Vargas fue a casa del testigo acompañado de un hermano y le pidió un galón de gasolina al hermano del testigo, que le fue entregado, sin decir para lo que era; que de ahí Vargas se dirigió a su casa y como a los cuatro o cinco minutos se vio que se incendió el carro que ellos tenían allí y al que él había ido a buscar el motor. El contrainterrogatorio de este testigo consistió mayormente de la confrontación que le hizo el fiscal con su declaración jurada prestada anteriormente. El testigo manifestó que solamente sabía firmar pero que no sabía leer. La declaración jurada anterior fue presentada en evidencia y le fue leída al jurado. El testigo se ratificó en que era correcto lo declarado en corte. Negó haberle declarado al fiscal que el acusado y Colón Pagán hubieran hurtado esas piezas.

Con la objeción del ministerio público, el tribunal oyó el testimonio del testigo de defensa Antonio Ortiz Báez, hermano del acusado. Manifestó que el 12 de enero de 1966, al mediodía, vio a Sergio Vargas sacando el motor del vehículo Chevrolet del 1956 en presencia de José Antonio Rodríguez. Allí no estaba el acusado ni Colón Pagán. El fiscal renunció a contrainterrogar a este testigo conforme a su objeción a que declarara.

El último testigo de defensa fue Rafael Colón Pagán. Manifestó que el 11 de enero de 1966, a las ocho y media de la noche, Sergio Vargas lo fue a ocupar para que lo llevara al barrio Pulguillas de Coamo a buscar un carro que él había comprado. El testigo rehusó porque no tenía automóvil, había vendido el suyo días antes para irse a Nueva York; que el automóvil de Sergio Vargas, Chevrolet de 1956, hacía dos meses que estaba malo; que Ángel Luis Rivera aceptó llevarlo al sitio y el testigo los acompañó porque Rivera sólo

poseía licencia de aprendizaje. En la carretera montaron al acusado Ortiz Báez; que al llegar al barrio Pulguillas, Vargas dijo que lo dejaran allí que iba a ver a su novia y luego se iría en el carro que había comprado, y de ahí ellos regresaron a su casa. Que el próximo día Vargas le pidió que le dijera a Andrés Cartagena que se viera con él para entregarle unas gomas, que ellos habían hablado anteriormente sobre ese negocio; que luego Cartagena le informó que le había comprado las gomas a Sergio. Dijo el testigo que trabajaba ganando $60 semanales, y el viernes 14 se fue para Nueva York hasta mayo. Fue acusado por estos hechos.

Al reanudarse la sesión del tribunal de instancia, luego de un receso, el fiscal solicitó una enmienda a las alegaciones de la acusación "amparándose en lo dispuesto en la Regla 38 de las de Procedimiento Criminal, en el sentido de que se le impute al acusado . . . en vez de que hurtó piezas de un automóvil Chevrolet del año 1956 tablilla 879-008, se corrija y se haga constar que el acusado se robó, hurtó el vehículo en su totalidad . . . ."

El apelante objetó la enmienda en cuestión por tardía y porque imputaba un delito completamente diferente; que estando en la etapa de la prueba de la defensa, "no estamos preparados para representar al acusado en un caso que se viene a responder de unas piezas y ahora se viene a responder del auto completo." Es aparente del récord que el fundamento de la defensa es que la enmienda en cuestión alega un delito distinto al alegado originalmente y que por lo tanto no procede de acuerdo con lo dispuesto en la referida Regla 38(d).

El juez de instancia determinó, entonces, que "con esta enmienda los derechos fundamentales del acusado se perjudican y por lo tanto debe posponerse el juicio para celebrarlo ante otro jurado . . ." y preguntó si la defensa se opondría a esto. Concluimos que estaba fundado en determinar que los derechos sustanciales del acusado se habían

perjudicado en vista de la alegación de la defensa de que no estaba preparada para enfrentarse a la acusación enmendada.

La defensa repite, en efecto, que la enmienda es tardía y que no está preparada para seguir el caso con esa enmienda; repetidamente se opone a que se siga viendo el caso, en armonía con su planteamiento de que la enmienda conlleva la alegación de un delito distinto. Indica que "el planteamiento que haríamos de señalarse el caso para otro día sería precisamente oponernos a que se celebre el caso tan siquiera", así fundamentando su planteamiento de delito distinto. Por último arguye que "De verse el caso con otro jurado sería precisamente un 'Double Jeopardy'."

Ante la oposición tan tenaz de la defensa, el juez de instancia ordenó la continuación de la vista del caso a base de la acusación enmendada. Preguntada la defensa si necesitaba tiempo, contestó que media hora. Añadió la defensa que ". . . nosotros nos oponemos a esa enmienda si su Señoría decide que se siga o no, como su Señoría ha dicho que vamos a proseguir con el caso yo no tengo más remedio que acatar la orden de su Señoría; yo me veo obligado a acatar la orden que es, como abogado, lo que tengo que hacer y sigo viendo el caso y *me opongo no solamente a que se vea por otro jurado sino que entiendo que no se puede ver ni por este jurado ni por ningún otro jurado, o sea, que nada se puede ver.*" (Énfasis nuestro.) Este planteamiento, repito una vez más, se basa, como consistentemente arguyó la defensa, en que la enmienda alega un delito distinto.

Al reanudarse la sesión, luego del receso de media hora, el juez de instancia volvió a repetir que entendía que el juicio debía posponerse para celebrarlo ante otro jurado y volvió a preguntar a la defensa si no se oponía a ello. Ésta contestó *"no nos oponemos a que su señoría la señale para que se vea ante otro jurado pero sin renunciar a ningún derecho que proteja al acusado."* (Énfasis nuestro.)

■ No tenemos duda que esta última expresión de la defensa constituye un consentimiento expreso, claro y explícito, que no deja lugar a dudas de que fue dado a la posposición del caso para verse ante otro jurado de acuerdo con lo dispuesto en la Regla 38(d). La expresión de que no se renunciaba a ningún derecho del acusado no hace dicho consentimiento menos expreso, claro o explícito, pues necesariamente se refería al planteamiento tantas veces hecho previamente de que la enmienda no procedía porque alegaba un delito distinto y por lo tanto debía sobreseerse el proceso según lo dispone el segundo párrafo de la Regla 38(d). La certeza de esto se comprueba por el hecho de que al iniciarse la segunda vista del caso ante otro jurado, la defensa planteó la improcedencia de la enmienda y ratificó su posición original al efecto de que debía archivarse el asunto bajo la Regla 38(d) párr. 2 ante su criterio de que la segunda enmienda imputaba un delito distinto, planteamiento que fue rechazado otra vez al concluir el juez que presidía la segunda vista del caso que se trataba del mismo delito de hurto.

En *Ríos Mora* v. *Tribunal Superior*, 95 D.P.R. 117 (1967), solicitada una enmienda a la acusación después de terminada la prueba de cargo, disuelto el jurado y señalado el caso para nuevo juicio, y planteada la cuestión de exposición anterior, dijimos que:

"Sin entrar a considerar si en verdad era necesaria la enmienda propuesta por el ministerio público ya que aparentemente no existía tal incongruencia o desacuerdo entre las alegaciones y la prueba que ameritara la aplicación de la Regla 38(d), lo cierto es que la actuación del tribunal al permitir la enmienda no afectó el derecho del acusado a un juicio justo e imparcial. La corte al permitir la enmienda ofreció a la defensa la alternativa de continuar la vista o disolver el jurado y concederle un nuevo juicio. Pero la defensa no aceptaba ni lo uno ni lo otro.

La actitud asumida por la defensa en el sentido de oponerse a la continuación de la vista obligó al magistrado que presidía el tribunal a adoptar la medida que creyó menos perjudicial al acusado que era disolver el jurado y empezar otro juicio. Era la menos perjudicial pues dada la actitud de la defensa de oponerse a la continuación del juicio, la corte hubiera tenido que nombrarle otro abogado, quien evidentemente no podía, aunque se pospusiera la continuación de la vista para que conferenciara con el acusado y los testigos, brindarle la misma asistencia que los abogados que le habían asistido desde el comienzo del proceso y que conocían todos los pormenores de la prueba. Un nuevo juicio ciertamente era más beneficioso al acusado."

Concluimos en *Ríos Mora*, supra, que bajo las circunstancias de dicho caso no podía invocarse el impedimento de exposición anterior para derrotar el nuevo juicio.

La única diferencia que existe entre *Ríos Mora*, supra, y el caso que nos ocupa consiste en que en aquél se mantuvo siempre la oposición de la defensa a la posposición del caso para verse ante otro jurado mientras que en la causa ante nos, la defensa por último consintió a tal posposición, cayendo así de lleno la situación procesal planteada dentro del marco de la Regla 38 (d).

En vista de lo expuesto, no podemos convenir en que el peticionario ha sido puesto en riesgo más de una vez de ser castigado. Éste no es un caso de doble exposición. La naturaleza de la enmienda de la acusación en este caso era sustancial y no meramente de defectos de forma. A nuestro juicio, el juez que presidió la primera vista del caso actuó correctamente, de acuerdo con lo dispuesto en la Regla 38 (d) al admitir la enmienda en cuestión y así conformar la acusación con la prueba, así como al insistir, en protección de los derechos del acusado, en la posposición del juicio para celebrarlo ante otro jurado a lo que accedió el peticionario.

*Por lo tanto, se anulará el auto expedido y se devolverá el caso al tribunal de instancia para la continuación de los procedimientos.*

El Señor Juez Presidente no intervino. El Juez Asociado Señor Santana Becerra disintió en opinión separada en la cual concurre el Juez Asociado Señor Hernández Matos.

—O—

Opinión disidente emitida por el Juez Asociado Señor Santana Becerra, en la cual concurre el Juez Asociado Señor Hernández Matos.

San Juan, Puerto Rico, a 26 de enero de 1970

Esta Opinión fue originalmente circulada como dictamen del Tribunal. Al no obtener los votos de una mayoría, la emito ahora como criterio disidente, con algunas observaciones finales.

—I—

Expedimos este recurso de *certiorari* para revisar el fallo de la Sala de Ponce del Tribunal Superior que negó la desestimación del presente proceso criminal comenzado por segunda vez, desestimación ésta solicitada al amparo de la garantía constitucional que protege al individuo contra el ser puesto en riesgo de ser castigado dos veces por el mismo delito.

Dispone la Constitución del Estado Libre Asociado de Puerto Rico en su Carta de Derechos, Art. II, Sec. 11, que:

"Nadie será puesto en riesgo de ser castigado dos veces por el mismo delito."

Conforme al precepto constitucional citado, y siguiendo los anteriores Arts. 162 y 169 del Código de Enjuiciamiento Criminal—ed. 1935—la Regla 64 (e) de las de Procedimiento Criminal de 1963 permite solicitar la desestimación de la acusación o denuncia por el fundamento:

"(e) Que el acusado ha sido convicto, *o ha estado expuesto a serlo,* o ha sido absuelto del delito que se le imputa. Si la moción para desestimar se basare en este fundamento, la misma expresará el nombre bajo el cual el acusado fue convicto, *expuesto a convicción* o absuelto, tribunal o lugar de convicción, *exposición* o absolución."

Se relacionan con el problema ante nos, además, las Reglas 38(d) y 144(d) y (e) de Procedimiento Criminal. La primera, 38(d), permite enmiendas a la acusación o denuncia o a un escrito de especificaciones y dispone que:

"La incongruencia o desacuerdo entre las alegaciones y la prueba no será fundamento para la absolución del acusado; pero el tribunal, *siempre que el acusado no se opusiere,* deberá posponer el juicio si es de opinión que los derechos sustanciales del acusado se han perjudicado, para celebrarlo ante otro jurado o ante el mismo tribunal si el juicio no fuere por jurado, y según el tribunal determinare.

Si la incongruencia o desacuerdo es de tal naturaleza que la prueba estableciere un delito distinto del imputado, no incluido en éste, o estableciere la comisión de un delito fuera de la competencia del tribunal, se deberá disolver el jurado *y se sobreseerá el proceso."*

La segunda, Regla 144(d) y (e), establece que el tribunal podrá ordenar la disolución del jurado, antes del veredicto, en los casos siguientes:

"(d) Si se hubiere *cometido algún error o se hubiere* incurrido en alguna irregularidad durante el proceso que, a juicio del tribunal, le impidiere al jurado un veredicto justo e imparcial.

(e) Por cualquier otra causa *si las partes consintieren* en ello. En todos los casos en que el jurado fuere disuelto según lo provisto en esta regla, la causa podrá ser juzgada nuevamente."

Expresándonos por el Tribunal en *Pueblo* v. *Arteaga Torres,* 93 D.P.R. 148 (1966), dijimos:

"El hecho de que al disolver un jurado *antes de veredicto*—sin que sea a petición o con la aquiescencia del acusado—, el Tribunal actúe bajo los supuestos del apartado (d) arriba transcrito de la Regla 144, no establece *per se* la validez ·de un segundo proceso por el mismo delito. El fundamento de lo dicho es que existe la garantía de orden constitucional, que protege al acusado no contra ser castigado dos veces sino contra *ser puesto en riesgo* de ser castigado dos veces por el mismo delito. *Downum* v. *United States,* 372 U.S. 734, 736; *Green* v. *United States,* 355 U.S. 184; *United States* v. *Ball,* 163 U.S. 662, 669.

Por lo tanto, la cuestión ante nos debe afrontarse no sólo a la luz de la autoridad permisible de la Regla 144 sino satisfaciendo además aquellas normas constitucionales que rigen la materia y que también harían permisible o no un segundo proceso sin que se violara la garantía." (Énfasis en el original.)

En este caso sostuvimos la validez del segundo proceso.

Analizando particularmente el significado y alcance de la Regla 144 (d) antes transcrita, en *Piñero Agosto* v. *Tribunal Superior,* decidido el 20 de marzo de 1967—94 D.P.R. 204—caso éste en que, a la luz de sus hechos y circunstancias presentes, sostuvimos la actuación de la Sala de instancia que disolvió un jurado antes del veredicto, volvimos a exponer: (págs. 212–213)

"Los dos importantes valores en la administración de la justicia criminal que en situaciones como la del récord están presentes al disolverse un jurado y terminarse el juicio antes del veredicto,—de un lado, la garantía de la integridad del proceso y la justicia e imparcialidad del fallo para una y otra parte, y del otro, la garantía constitucional que acompaña a todo individuo de no ser 'puesto en riesgo de ser castigado dos veces por el mismo delito',—requieren que el juez que preside la causa haga la más completa depuración de la verdad de los hechos que se invocan para la disolución y terminación del proceso en protección por igual de ambos valores en juego y del interés tanto del Pueblo como del acusado. La debida sustanciación de los hechos y el establecer aquellos que sean ciertos, por métodos judiciales según dijimos en *Pueblo* v. *Rivera,* 67 D.P.R. 280 (1947), es fundamentalmente la responsabilidad del juez que

preside, por cuanto sobre esos hechos ciertos así determinados ejerce él su función delicada y por lo regular nada fácil de dictaminar, en el ejercicio de una sana discreción, cuándo y hasta qué extremo están adversamente afectados la integridad del proceso y el pronunciamiento de un veredicto justo e imparcial para una y otra parte de modo que sea imperativa la terminación del juicio; aunque con ello vaya envuelta la garantía constitucional del ciudadano de no quedar en riesgo de ser castigado dos veces por igual delito."

A los principios normativos expuestos, creemos apropiado añadir ahora algo más.

Dentro de ese complejo y sensitivo mecanismo *sui generis* que ha seguido el Tribunal Supremo de los Estados Unidos en lo que respecta a su federalismo y las garantías constitucionales de la Carta de Derechos de su Constitución—Enmiendas I a VIII—y que por 136 años se ha estado debatiendo desde que el Juez Marshall en *Barron* v. *Baltimore*, 32 U.S. 242 (1833) rechazó la proposición de que la Carta de Derechos como un solo cuerpo restringía la acción de los gobiernos estatales; [1] y a medida que el Tribunal Supremo ha ido imponiendo a los Estados el cumplimiento de ciertas garantías de la Carta de Derechos bajo el criterio de que esa garantía participa de la esencia misma de una estructura de ordenada libertad; [2] o es parte de esos principios fundamentales de libertad y justicia que están en los cimientos de todas nuestras instituciones civiles y políticas; [3] o que

---

[1] La garantía envuelta en el caso de *Barron* era la prohibición de la Enmienda V contra la expropiación de propiedad privada para el uso público sin una justa compensación. Marshall sostuvo que esta prohibición no restringía la acción de los Estados. Por supuesto, 64 años después el Tribunal Supremo en *Chicago, B.&Q.R. Co.* v. *City of Chicago*, 166 U.S. 226 (1897) impuso a los Estados, a través del debido procedimiento de la Enmienda XIV, esta protección.

[2] "of the very essence of a scheme of ordered liberty."—*Palko* v. *Connecticut*, 302 U.S. 319.

[3] "those fundamental principles of liberty and justice which lie at the base of all our civil and political institutions."—*Hurtado* v. *California*, 110 U.S. 516.

está entre aquellas inmunidades personales hondamente enraizadas en las tradiciones y en la conciencia de nuestra gente como para considerársele como fundamental,(⁴) la garantía de la *Enmienda V* contra el riesgo de ser castigado dos veces por el mismo delito no se había considerado ser de la naturaleza mencionada como para imponérsela a los Estados a través del debido procedimiento de la Enmienda XIV. *Palko* v. *Connecticut,* 302 U.S. 319, 322 (1937).

Todavía en 1957 el Juez Frankfurter, quizás el más destacado exponente y defensor del mecanismo de la incorporación paulatinamente de la Carta de Derechos a los Estados dentro de ese "esquema de ordenada libertad o de inmunidades fundamentales enraizadas en las tradiciones y la conciencia de la gente"—frente al criterio de imponer a los Estados toda la Carta de Derechos de una vez del cual el Juez Murphy fue uno de sus más connotados defensores— se expresaba así en *Gore* v. *United States,* 357 U.S. 386, 392, en torno a la doble exposición:

"Al aplicar una disposición como ésa de la exposición doble, que tiene sus raíces en la historia *y no es un concepto evolutivo como el del debido procedimiento,* un largo curso de adjudicación de esta Corte lleva una impresionante autoridad."

Sin embargo, el 23 de junio de 1969 el Tribunal Supremo, por voz del Juez Sr. Marshall, revocó a *Palko* v. *Connecticut* y se alejó de ese largo curso de impresionante autoridad en *Benton* v. *Maryland,* 395 U.S. 784, 794:

"Sólo en el anterior Término encontramos que el derecho a juicio por jurado en casos criminales es 'fundamental a la estructura americana de justicia', *Duncan* v. *Louisiana,* 391 U.S. 145, 149, (1968) y sostuvimos que el derecho de la Enmienda Sexta a juicio por jurado era aplicable a los Estados a través

---

(⁴) "so rooted in the traditions and conscience of our people as to be ranked as fundamental."—*Snyder* v. *Massachusetts,* 291 U.S. 97. Véase: Juez Brennan, Jr., "The Bill of Rights and the States", James Madison Lecture, New York University, 1961.

de la Enmienda Catorce. Por las mismas razones, resolvemos hoy que la prohibición contra *la doble exposición* de la Enmienda Quinta representa un ideal fundamental en nuestra herencia constitucional, y que debe aplicársele a los Estados a través de la Enmienda Decimocuarta. En tanto es incompatible con este pronunciamiento, *Palko* v. *Connecticut* se revoca . . . ."

Palko representaba un enfoque de los derechos constitucionales básicos que esta Corte ha rechazado en decisiones recientes. Estaba confeccionado de la misma tela que *Betts* v. *Brady,* 316 U.S. 455 (1942) [*] el caso que resolvió que el derecho a abogado de un acusado en proceso criminal se determinaría decidiendo en cada caso si la negativa de ese derecho era 'repulsiva al sentido universal de justicia'. Descansaba en *Twining* v. *New Jersey,* 211 U.S. 78 (1908), que sostuvo que el derecho contra la auto incriminación compulsoria no era un ingrediente del debido procedimiento de la Decimocuarta Enmienda . . . . Una vez que se resuelve que una garantía particular es 'fundamental al sistema Americano de justicia', *Duncan* v. *Louisiana,* supra, a la pág. 149, el mismo patrón constitucional se aplica contra ambos, el gobierno federal y el estatal. Las raíces de *Palko* han sido cercenadas años ha. Hoy sólo reconocemos lo inevitable." (5)

[*] Revocado por *Gideon* v. *Wainwright,* 372 U.S. 335.

(5) De las 25 garantías sustantivas y procesales de la Carta de Derechos federal, bajo el aludido mecanismo constitucional-federalista el debido procedimiento de la Enmienda XIV ha absorbido, imponiéndoselos a los Estados:

(a) Toda la Primera Enmienda empezando en 1925—*Gitlow* v. *New York,* 268 U.S. 652; *Near* v. *Minnesota,* 283 U.S. 697;

(b) La Cuarta Enmienda—*Wolf* v. *Colorado,* 338 U.S. 25 (1949) según fue esta decisión afectada y complementada por *Mapp* v. *Ohio,* (1961), 367 U.S. 643;

(c) Con la anterior decisión de *Benton* v. *Maryland* se ha absorbido la Quinta Enmienda, excepto la cláusula relativa a la acusación por gran jurado, cf. *Hurtado* v. *California,* (1884) 110 U.S. 516;

(d) *Pointer* v. *Texas,* (1965) 380 U.S. 400, (Cláusula de confrontación) y las más recientes decisiones de *Klopfer* v. *North Carolina,* 386 U.S. 213, (1967—juicio rápido) y *Duncan* v. *Louisiana,* (1968—juicio por jurado) 391 U.S. 145—terminan de absorber las garantías de la Sexta Enmienda;

(e) *Robinson* v. *California,* 370 U.S. 660 (1962), incorporó la ga-

Es significativo el hecho de que no obstante ser ahora, recientemente, que el Tribunal Supremo de los Estados Unidos ha decretado que la garantía constitucional contra el estar expuesto más de una vez a ser castigado por el mismo delito constituye una de esas garantías fundamentales y básicas al sistema libertario de justicia americano y a sus instituciones civiles al extremo de imponerla a los Estados como debido procedimiento de la Enmienda XIV cuando antes había dictaminado lo contrario, ya en 1917 el Congreso, que según *Balzac* v. *Porto Rico*, 258 U.S. 298, venía obligado a hacer valer en los territorios ciertas garantías consideradas fundamentales de la Constitución (págs. 312–313), extendió ésa contra la doble exposición y la dio a los habitantes de Puerto Rico a través de la Carta de Derechos de la Ley Jones, y ello a pesar de que no extendió en ese entonces otras garantías de la Carta de Derechos federal. En lo que a Puerto Rico concierne, aparentemente el Congreso anticipó el criterio de garantía fundamental contra la doble exposición ahora consagrado para beneficio de los habitantes de los Estados en la decisión de *Benton*.

Con los anteriores principios normativos en mente, veamos el problema constitucional a la luz de los hechos y circunstancias de este caso.

—II—

En 9 de noviembre de 1966 comenzó el juicio en la Sala de Ponce del Tribunal Superior del caso del *Pueblo de Puerto Rico* v. *Osvaldo Ortiz Báez*, por hurto mayor, Criminal G-66-103. Debidamente constituido y juramentado el jurado, por orden del Tribunal el Secretario procedió a leerles la siguiente acusación:

rantía contra castigos crueles e inusitados de la Octava Enmienda.

Las Enmiendas II y III se refieren al derecho del pueblo a tener armas y al acuartelamiento de soldados; la Enmienda VII al juicio por jurado en casos civiles, que no ha sido incorporado bajo dicho mecanismo.

"El Fiscal formula acusación contra OSVALDO ORTIZ BAEZ, residente en Bo MATON ABAJO, Cayey, P.R. por un delito de HURTO MAYOR (Felony) cometido de la siguiente manera:

El referido acusado OSVALDO ORTIZ BÁEZ, allá en o por el día 11 de enero de 1966, y en Coamo, Puerto Rico, dentro de la jurisdicción de El Tribunal Superior de Puerto Rico, Sala de Ponce, allí y entonces, dicho acusado, ilegal, voluntaria y maliciosamente, y con la intención criminal de lucrarse y privar absoluta y permanentemente de su propiedad a su legítimo dueño, *sustrajo del automóvil del señor ELIGIO LOPEZ RIVERA varias piezas valoradas en más de $100.00 (cien dólares) todo lo cual no era pertenencia de dicho acusado y sí del señor ELIGIO LOPEZ RIVERA.*

Este hecho es contrario a la Ley para tal caso prevista y a la paz y dignidad de 'El Pueblo de Puerto Rico'.

(Firmado) PEDRO LUIS RUIZ ORTIZ

Fiscal."

*(Énfasis puesto.)*

El ministerio público expuso su teoría del caso al jurado y les dijo que trataría de probarles que el 10 de enero de 1966 Eligio López Rivera llegó al Barrio Pulguillas de Coamo en su automóvil o que estaba a nombre suyo y dejó estacionado el vehículo frente a la residencia de una tía suya; que al otro día por la mañana el automóvil había desaparecido del lugar; que se querelló a la policía y luego el vehículo apareció en el Barrio Matón de Cayey desmantelado de sus piezas y quemado; que las piezas del carro posteriormente se vendieron por el acusado y otro más a distintas personas; que las piezas vendidas fueron sacadas del vehículo y coincidían con las del vehículo que le había sido hurtado a Eligio López.

Es aparente, ya desde este momento, que el fiscal ofrecía establecer el hurto de un carro dentro del marco de los hechos expuestos en la acusación. La defensa no interpuso

objeción, ni el ministerio público ofreció en ese entonces enmendar las alegaciones. Así comenzó el proceso.

El primer testigo del Pueblo fue Clotilde López Rodríguez. Declaró que era residente del Barrio Pulguillas de Coamo; que Eligio López era su hijo y ahora se encontraba en Vietnam; que para el 12 de enero de 1966 su hijo tenía un automóvil Chevrolet de 1956 color amarillo y negro comprado por el testigo; que el vehículo estaba a nombre suyo y lo utilizaba su hijo; que el 11 de enero su hijo vino a su casa y estacionó el vehículo frente a la casa de una tía de él; que esa noche no utilizaron el carro y por la mañana el vehículo no estaba allí. Notificaron al cuartel de la policía de Aibonito ese mismo día. Volvió a ver el vehículo, quemado, el día 14 cuando la policía les notificó que lo habían encontrado en Cayey. Le faltaban el motor, las gomas y la transmisión. Fijó el valor del vehículo en esa fecha en $1,500.

Después de ser contrainterrogado este testigo, y en ausencia del jurado, el ministerio público solicitó que se le permitiera enmendar la acusación para que dispusiera en su lugar "que el vehículo era propiedad del señor Clotilde López Rodríguez, pero bajo la posesión inmediata de su hijo el señor Eligio López Rivera." Con la oposición de la defensa el tribunal accedió a que se enmendara la acusación. Preguntó entonces si había objeción a que se suspendiera el juicio a lo cual contestó la defensa, primeramente, que no tenía objeción pero luego, después de otras consideraciones manifestó que el caso debía continuar, y así lo dispuso la Sala. (R. I, págs. 25-26.)

Acto seguido, se le volvió a leer la acusación en su totalidad al jurado con la enmienda aceptada según transcrita. (R. I, pág. 27.) Continuó el proceso y el fiscal anunció el testimonio de Sergio Vargas Miranda. Por segunda vez la Sala preguntó si "habiéndose emitido la resolución del Tribunal ¿la Defensa no tiene objeción a que continue el caso?"

Expresó la defensa: "No tenemos objeción a que continue el caso con la salvedad hecha por la defensa." (R. I, pág. 28.) La salvedad era que entendía que la incongruencia constituía un delito distinto.

El Sr. Sergio Vargas Miranda prestó testimonio en el sentido de que era residente del Barrio Matón Abajo de Cayey el 11 al 12 de enero de 1966; que conocía al acusado y a otra persona llamada Rafael Colón Pagán desde hacía 21 años; el 12 de enero el testigo tenía su automóvil estacionado con el motor en el piso para repararlo y como a las diez de la mañana el acusado y Colón Pagán le ofrecieron venderle el motor de ese carro por $75. El testigo hizo el negocio en presencia de Miguel Ángel Rivera que tenía carro y de un mecánico de nombre José Antonio Rodríguez, éste sacó el motor del carro y se condujo donde estaba el otro. El vehículo del motor vendido estaba estacionado frente a la casa del acusado Osvaldo Ortiz, tenía capota amarilla, el bonete y la parte de abajo negros, y era del año 1956. El motor comprado lo llevó Miguel Ángel Rivera y lo montó José Antonio Rodríguez. El acusado y Pagán le informaron que el motor era de ellos. Posteriormente declaró el testigo que el acusado y Pagán vendieron las gomas a Andrés Cartagena residente también del barrio. Después llegaron los guardias y le dijeron que el motor no era de ellos, que era hurtado y querían llevarse las piezas. El testigo no tuvo objeción a que se llevaran las piezas y también el carro suyo con el motor montado. Además del motor le compró al acusado y a Pagán la transmisión y el radiador por los $75. No conocía al dueño del vehículo y dijo que si hubiese sabido que el automóvil era hurtado no hubiera comprado eso.

La defensa sometió a este testigo a un amplio contrainterrogatorio que tendió a establecer que la persona a quien verdaderamente le imputaban el hurto del vehículo era el testigo, quien aceptó que tenía un vehículo del mismo mo-

delo y año y necesitaba un motor. Hacía como tres o cuatro meses que estaba reparando su carro. En efecto, el testigo manifestó que la policía le dijo que a él le imputaban el hurto del automóvil, que estuvo siendo interrogado por tres policías durante tres días y la noche en parte, en un pequeño cuartito en el cuartel. (⁶)

El próximo testigo del ministerio público fue Andrés Cartagena Meléndez. Declaró que para enero de 1966 era porteador público entre Cayey y Aibonito; que conocía al acusado, nacidos en el mismo barrio, al igual que a Rafael Colón Pagán; que el 11 de enero de 1966 el acusado Ortiz y Colón Pagán fueron a ofrecerle las gomas y a dárselas baratas; el testigo aceptó comprarlas y ellos le dijeron que eran de un carro que habían comprado y le vendían las gomas porque necesitaban dinero. Les dio $10 para luego darles $10 más por tres gomas con sus aros, color amarillo; que vio el carro de donde salieron las gomas en una finca de Matón y Rafael Colón lo llevó allí. Ortiz lo estaba esperando. El testigo usó dos gomas en su automóvil y al enterarse más tarde de algo, devolvió las gomas al acusado Ortiz y a Colón y se comunicó con la policía. El acusado y Pagán le dijeron que no se apurara que podía correr las gomas porque el carro no iba a aparecer.

Este testigo fue igualmente contrainterrogado con miras a establecer que él tenía conocimiento de que las gomas eran bienes hurtados. Aceptó que al comprar las gomas los aros estaban pintados de amarillo y que él los pintó entonces de colorado. Dijo que sabía que el acusado no sabía guiar ni tenía licencia de conducir. Manifestó el testigo a preguntas del Fiscal que el acusado y su acompañante le habían dicho que

---

(⁶) Con motivo de esta prueba la defensa pidió que se excluyera todo el testimonio del testigo a base de que se habían violado las normas de *Escobedo* y *Miranda* porque al testigo se le cuestionaba como sospechoso y no se le habían hecho las advertencias pertinentes. El tribunal declaró sin lugar la exclusión por el fundamento de que el testigo no era acusado.

no se apurara que ya el carro lo habían desaparecido, que se habían robado el carro en Pulguillas y que se callara que no se iba a saber nada.

Siguió el testigo del Pueblo José Antonio Rodríguez Falcón. Declaró que el carro de Vargas se le rompió frente a donde vivía el testigo y Vargas le dijo que iba a comprar el motor para ponérselo; sacó el motor que estaba roto. Miguel Ángel llevó el motor y el testigo lo montó. No sabe de dónde salió el motor. Repreguntado, negó haber visto transacción sobre este motor con el acusado.

Declaró después el testigo Argimiro Ortiz Vega. Dijo haberle comprado a Eligio López Rivera un motor Chevrolet para un carro suyo de 1956. Montado el motor en su carro, vino la policía a investigar y le encontró el número al motor. Era el 0095767 F 562. Contrainterrogado no pudo decir de memoria el número de su seguro social, que lo tenía desde 1950.

El siguiente testigo del Pueblo fue el agente Antonio Espada. Dijo que hizo la investigación de este automóvil hurtado que apareció desmantelado en el Barrio Matón. Andrés Cartagena informó el caso. Ocuparon el motor y algunas piezas. Ocupó la tablilla, Núm. 879-008. No interrogó al acusado antes de someter el caso porque se había ido del barrio. Repreguntado dijo que el carro quemado no tenía tablillas. Estas se las entregó el testigo Sergio Vargas quien las tenía en su poder. Encontró a Sergio Vargas con las piezas del carro desaparecido en la carretera.

Con esta prueba y una Certificación del Departamento de Obras Públicas sobre la tablilla, el ministerio público sometió el caso. Renunció a sus testigos Miguel Ángel Rivera y el agente Zayas. La defensa luego utilizó el testimonio de Miguel Ángel Rivera.

El acusado solicitó una absolución (*non-suit*) porque: (1) la prueba era insuficiente para identificar las piezas hurta-

das, y (2) no se había probado el valor de éstas a los efectos del grado mayor de hurto.

Este planteamiento fue objeto de una extensa discusión entre las partes y el magistrado, quien declaró sin lugar la solicitud de absolución (non-suit) a base de que había completa identificación en la prueba de las piezas hurtadas; y de que el valor de las mismas podía surgir para el jurado de los elementos de juicio que contenía la prueba. (R. III, págs. 2-16.)

. Comenzada la prueba de la defensa ésta produjo, como primer testimonio, la declaración del testigo Miguel Ángel Rivera Mercado, testigo del Pueblo renunciado por el fiscal. Declaró que el 13 ó 14 de enero de 1966 Sergio Vargas Miranda le pidió que le condujera un motor para ponérselo a su carro Chevrolet del 1956; que este vehículo hacía como dos meses no funcionaba; que el motor que transportó Vargas lo tenía enganchado a un árbol cerca de un carro que le había dicho que había comprado en el barrio Pulguillas de Aibonito. Que en ningún momento vio transacciones con ese motor entre el acusado y Vargas, ni con Rafael Colón. Que el acusado no sabe guiar automóviles. Que al otro día Vargas fue a casa del testigo acompañado de un hermano y le pidió un galón de gasolina al hermano del testigo que le fue entregado, sin decir para lo que era; que de ahí Vargas se dirigió a su casa y como a los 4 ó 5 minutos se vio que se incendió el carro que ellos tenían allí y al que él había ido a buscar el motor. El contrainterrogatorio de este testigo consistió mayormente de la confrontación que le hizo el fiscal con su declaración jurada prestada anteriormente. El testigo manifestó que solamente sabía firmar pero que no sabía leer. La declaración jurada anterior fue presentada en evidencia y le fue leída al jurado. El testigo se ratificó en que era correcto lo declarado en corte. Negó haberle declarado al fiscal que el acusado y Colón Pagán hubieran hurtado esas piezas.

Con la objeción del ministerio público el tribunal oyó el

testimonio del testigo de defensa Antonio Ortiz Báez, hermano del acusado. Manifestó que el 12 de enero de 1966 al mediodía vio a Sergio Vargas sacando el motor del vehículo Chevrolet del 56 en presencia de José Antonio Rodríguez. Allí no estaba el acusado ni Colón. El fiscal renunció a contrainterrogar a este testigo conforme a su objeción a que declarara.

El último testigo de defensa fue Rafael Colón Pagán. Manifestó que el 11 de enero de 1966 a las ocho y media de la noche Sergio Vargas lo fue a ocupar para que lo llevara al barrio Pulguillas de Coamo a buscar un carro que él había comprado. El testigo rehusó porque no tenía automóvil, había vendido el suyo días antes para irse a Nueva York; que el automóvil de Sergio Vargas, Chevrolet de 1956, hacía dos meses que estaba malo; que Ángel Luis Rivera aceptó llevarlo al sitio y el testigo los acompañó porque Rivera sólo poseía licencia de aprendizaje. En la carretera montaron al acusado Ortiz; que al llegar al barrio Pulguillas, Vargas dijo que lo dejaran allí que iba a ver a su novia y luego se iría en el carro que había comprado, y de ahí ellos regresaron a su casa. Que el próximo día Vargas le pidió que le dijera a Andrés Cartagena que se viera con él para entregarle unas gomas, que ellos habían hablado anteriormente sobre ese negocio, que luego Cartagena le informó que le había comprado las gomas a Sergio. Dijo el testigo que trabajaba ganando $60 semanales, y el viernes 14 se fue para Nueva York hasta mayo. Fue acusado por estos hechos.

Terminado este testimonio el tribunal recesó. Al reanudarse la sesión ocurrieron los siguientes procedimientos que transcribimos en su totalidad por ser esenciales a la cuestión constitucional planteada: (R. III, págs. 70–81.)

"FISCAL RUIZ:

Señor juez, antes de que se traiga al jurado este fiscal, nuevamente, va a solicitar de Su Señoría una enmienda a las alegaciones de la acusación amparándose en lo dispuesto en la Regla

38 de las Reglas de Procedimiento Criminal, en el sentido de que se le impute al acusado Osvaldo Ortiz Baéz, en vez de que hurtó piezas de un automóvil Chevrolet del año 1956, tablilla 879008, se corrija y se haga constar que el acusado se robó, hurtó el automóvil en su totalidad, el automóvil marca Chevrolet, tablilla 879008, del año 1956, perteneciente al señor Clotilde López Rodríguez y que en el momento que ocurrieron los hechos estaba en la posesión de Eligio López.

HON. JUEZ:

Defensa.

LCDO. GOGLAS:

Nosotros objetamos esa enmienda a estas alturas, entendemos que es tardía, además entendemos que es imputar un delito completamente diferente a estas alturas, es tardío; eso no fue de lo que se vino a defender el acusado.

HON. JUEZ:

Bien, entonces antes de resolver el tribunal quiere que la taquígrafa le lea la enmienda solicitada. ¿La taquígrafa cogió eso?

ESTENOTIPISTA:

Sí, señor juez.

HON. JUEZ:

¿Usted podría leer la parte de la enmienda?

ESTENOTIPISTA:

Sí, señor juez. (La estenotipista lee)

HON. JUEZ:

¿Y en cuanto al valor de la propiedad?, eso se dejó. Se alega que las piezas valían más de cien dólares.

FISCAL RUIZ:

Que diga que dicho automóvil tenía un valor en el mercado superior a la cantidad de cien dólares.

HON. JUEZ:

Bien, esa es la petición que ha interpuesto la defensa, digo, que ha interpuesto el fiscal. Hemos oído los argumentos de la defensa en el sentido de que se opone a que sea enmendada la acusación por ser tardía. ¿Están bien expresados los argumentos de la defensa? ¿Qué dice la Regla 38?, en su inciso 'd' dice: El tribunal podrá permitir enmiendas a la acusación, a la denuncia

o a un escrito de especificaciones en cualquier momento antes de la convicción o absolución del acusado—en este momento no ha habido ni convicción ni absolución del acusado—en caso que hubiere incongruencia entre estas alegaciones y la prueba. La incongruencia o desacuerdo entre las alegaciones y la prueba no será fundamento para la absolución del acusado, pero el tribunal, siempre que el acusado no se opusiere, deberá posponer el juicio si es de opinión que los derechos sustanciales del acusado se han perjudicado para celebrarlo ante otro jurado o ante el mismo tribunal si el juicio no fuere por jurado y según el tribunal determinare.

LCDO. GOGLAS:

Vuestro Honor, nosotros, abundando más en nuestra objeción . . .

HON. JUEZ:

Adelante.

LCDO. GOGLAS:

. . . si se permite esa enmienda, entonces no estamos preparados para ese caso, según se nos informa.

HON. JUEZ:

Muy bien.

LCDO. GOGLAS:

Precisamente a estas alturas se está ya en la prueba de defensa, nosotros no estamos preparados para representar al acusado en un caso que se viene a responder de unas piezas y ahora se viene a responder del carro completo.

HON. JUEZ:

Correcto, entonces el tribunal entiende que a estas alturas es procedente la enmienda porque todavía no ha habido ni convicción ni absolución del acusado. Ahora bien, ¿qué sucede?, el tribunal ahora, en estos momentos, es de opinión que con esta enmienda los derechos sustanciales del acusado se perjudican y por lo tanto es criterio de este tribunal que debe posponerse el juicio para celebrarlo ante otro jurado o ante el mismo tribunal. Ahora pregunto al acusado, ¿se opondría el acusado a que se suspendiera el caso ahora para que se vea ante otro jurado?

LCDO. GOGLAS:

Digo, el planteamiento de nosotros es dual, primero que no procede la enmienda a estas alturas y segundo que nosotros no

vinimos preparados para entender en un caso según se está enmendando la acusación por el compañero y que por lo tanto nosotros no estamos preparados, si Su Señoría declara con lugar esa enmienda no estamos preparados para seguir el caso, con ese caso.

HON. JUEZ:

La primera resolución, compañero, es que el tribunal declara con lugar la moción para que se enmiende la acusación tal y como el fiscal dice y por lo estatuido en la Regla 38. Esa es la primera resolución. Segunda resolución, habiéndose declarado con lugar la petición del fiscal para que se enmiende la acusación, amparándonos en lo dispuesto en la Regla 38 inciso 'd' entiende el tribunal que con la enmienda quedarán perjudicados los derechos del acusado y por lo tanto en vista de ello pregunta al acusado si no se opone a que los procedimientos se vean ante otro jurado.

LCDO. GOGLAS:

Digo, nosotros nos oponemos.

HON. JUEZ:

¿Quiere que el caso se siga viendo aún con la enmienda?

LCDO. GOGLAS:

Nosotros nos oponemos a que siga viendo el caso.

HON. JUEZ:

La Regla 38 es clara.

LCDO. GOGLAS:

Bueno, Vuestro Honor, nosotros nos oponemos a que se siga viendo el caso.

HON. JUEZ:

¿Se opone a que se vea ante otro jurado?

LCDO. GOGLAS:

Sí, nos oponemos, entendemos que no se puede ver el caso.

HON. JUEZ:

¿El compañero quiere ver la regla 38?

LCDO. GOGLAS:

La conocemos y dentro de su discreción y conocimiento de la ley nosotros nos oponemos.

HON. JUEZ:

¿A que el caso se siga viendo hoy?

LCDO. GOGLAS:

Hoy y cuando se señale el caso, según la enmienda, nosotros haremos el planteamiento.

HON. JUEZ:

¿No se opone a que se vea ante otro jurado?

LCDO. GOGLAS:

Es que, perdone Vuestro Honor, el planteamiento que haríamos de señalarse este caso para otro día sería precisamente oponernos a que se celebre el caso tan siquiera.

HON. JUEZ:

¿Entonces quiere que siga el caso?

LCDO. GOGLAS:

No, nosotros nos oponemos a que se vea el caso.

HON. JUEZ:

¿Cómo?

LCDO. GOGLAS:

De verse el caso con otro jurado sería precisamente un 'double jeopardy'.

HON. JUEZ:

La regla a nuestro juicio es clara, la Regla 38 inciso 'd' y a base de eso hemos declarado que la enmienda es procedente. Lo que quisiéramos es que aclare el colega en cuanto a esta parte 'si el acusado no se opusiere, deberá posponerse el juicio', ¿el acusado se opone a que se continúe el caso en el día de hoy aun con la enmienda? ¿Ha entendido el colega?

LCDO. GOGLAS:

¡Me ha declarado con lugar la enmienda y va a continuar el caso!

HON. JUEZ:

La regla es clara, yo he declarado con lugar la petición del Ministerio Público, y entendiendo que se perjudican los derechos sustanciales del acusado porque ya es un carro en vez de unas piezas, pues, entonces amparado en lo dispuesto en la Regla 38 inciso 'd' pregunto al acusado si no se opone a que el juicio se vea ante otro jurado.

LCDO. GOGLAS:

Es que nosotros nos oponemos. Nosotros no queremos renunciar a ningún planteamiento que pueda favorecer al acusado

con motivo de la decisión de Su Señoría de seguir o no seguir el caso; nosotros no queremos a base de la pregunta que formula Su Señoría hacer ninguna afirmación que vaya en detrimento de cualquier derecho que favorezca a mi representado.

HON. JUEZ:

Bien, oponiéndose la defensa a que este caso se vea por otro jurado es procedente que continuemos la vista en el día de hoy. Con motivo de que va a continuar la vista con la enmienda pregunto a la defensa si necesita tiempo en vista de la nueva situación.

LCDO. GOGLAS:

Antes de contestar esa pregunta quiero hacer bien claro, Vuestro Honor, que este abogado en representación de Osvaldo Ortiz Báez en ningún momento está renunciando ni expresa ni implícitamente a cualquier derecho que se pueda plantear por una infracción o violación de un derecho que la ley y la Constitución le concede a mi representado. En otras palabras, nuestro planteamiento es que el compañero fiscal quiere enmendar su alegación, Su Señoría se lo permite y nostros nos oponemos ahora a que Su Señoría siga o no siga el caso y dejamos a Su Señoría que decida.

HON. JUEZ:

La regla es clara colega y el acusado y su abogado tienen que contestar categóricamente de acuerdo con lo que dice la regla.

LCDO. GOGLAS:

Ahí es que está la cosa, nosotros no podemos contestar categóricamente.

HON. JUEZ:

¿No puede contestar si se opone o no?

LCDO. GOGLAS:

Fíjese, ¿qué se entiende por oponerse o no a que se vea ante otro jurado?, esa es la primera cuestión, si eso conlleva, Vuestro Honor, a que nos oponemos a que se siga viendo el caso estamos implícitamente aceptando que otro jurado lo vea y que estamos implícitamente renunciando a cualquier planteamiento que pudiera favorecer al acusado, esa es nuestra posición.

HON. JUEZ:

Como la defensa se opone a que el caso se vea ante otro jurado seguirá el caso viéndose en el día de hoy para preparar la nueva situación que ha surgido.

LCDO. GOGLAS:

Sí, vamos a necesitar tiempo.

HON. JUEZ:

¿Cuánto tiempo?

LCDO. GOGLAS:

Media hora más.

HON. JUEZ:

Como no.

LCDO. GOGLAS:

Aparentemente estamos en el informe, ¿Su Señoría entiende que lo que yo digo no es lo que quiero decir? Yo he informado para récord el planteamiento de la defensa.

HON. JUEZ:

¿Dígame, qué quiere decir entonces?

LCDO. GOGLAS:

Que nosotros en ningún momento estamos renunciando a cualquier derecho, este, ni a cualquier derecho constitucional o de ley estatuído que la ley le conceda o la constitución al acusado; o sea, que nosotros nos oponemos a esa enmienda si Su Señoría decide que se siga o no, como Su Señoría ha dicho que vamos a proseguir con el caso yo no tengo más remedio que acatar la orden de Su Señoría; yo me veo obligado a acatar la orden que es, como abogado, lo que tengo que hacer y sigo viendo el caso y me opongo no solamente a que se vea por otro jurado sino que entiendo que no se puede ver ni por este jurado ni por ningún otro jurado, o sea, que nada se puede ver.

HON. JUEZ:

¿Se opone a que se vea ante jurado?

LCDO. GOGLAS:

Yo me opongo en el sentido de verse este caso otra vez ante otro jurado u otro juez o el mismo juez, se estarían violando los derechos de este acusado de manera que entonces lo que conllevaría es que Vuestro Honor decida y Su Señoría ha concluído

que vamos a seguir el caso y yo lo que Su Señoría me ordene lo acato, no me queda más remedio.

HON. JUEZ:

Eso es porque el colega se opone a que se vea con otro jurado.

LCDO. GOGLAS:

Yo me opongo en el día de hoy, si procede verse ante otro jurado o no que Su Señoría decida, yo me opongo en la forma más enérgica a que siga en el día de hoy.

HON. JUEZ:

La regla es clara.

LCDO. GOGLAS:

Es una cuestión de interpretación.

HON. JUEZ:

La regla está bien clara, mire colega lo que dice: 'el tribunal podrá permitir enmiendas a la acusación, a la denuncia o a un escrito de especificaciones en cualquier momento antes de la convicción o absolución del acusado, en caso que hubiere incongruencia entre estas alegaciones y la prueba; las incongruencias o desacuerdo entre las alegaciones y la prueba no será fundamento para la absolución del acusado, pero el tribunal, siempre que el acusado no se opusiere, deberá posponer el juicio si es de opinión que los derechos sustanciales del acusado se han perjudicado para celebrarlo ante otro jurado o ante el mismo tribunal si el juicio no fuere por jurado y según el tribunal determinare.' Entonces, como el colega se opone . . .

LCDO. GOGLAS:

Podríamos resumir mi planteamiento en la siguiente forma: Yo me opongo a que se siga viendo según enmendado y me opongo a que lo vea otro jurado.

HON. JUEZ:

Está bien.

LCDO. GOGLAS:

En otras palabras, que se debe seguir el caso según originalmente se empezó.

HON. JUEZ:

Bien, ¿dijo que necesita media Hora?

LCDO. GOGLAS:

Sí, Vuestro Honor.

HON. JUEZ:

Si necesita más tiempo me lo deja saber. Receso del tribunal hasta que el colega diga que está preparado.

[Después del Receso]

Para la continuación en torno al caso, para el récord, G-66-103, El Pueblo versus Osvaldo Ortiz Báez; hurto mayor. Bien, se había solicitado una enmienda por el representante del ministerio público al amparo de la Regla 38 inciso 'd', el tribunal declaró con lugar la petición de enmienda propuesta por el representante del ministerio público y siendo de opinión que los derechos sustanciales del acusado se ven perjudicados, se han perjudicado, el tribunal entiende que debe posponer el juicio para celebrarlo ante otro jurado y pregunta al acusado si no se opone a que se posponga este juicio para celebrarlo ante otro jurado, ahora.

LCDO. GOGLAS:

Vuestro Honor, no nos oponemos a que Su Señoría lo señale para que se vea ante otro jurado, pero sin renunciar ningún derecho que proteja al acusado.

HON. JUEZ:

Pués, en vista de la resolución rendida por el tribunal y que el acusado no se opone a que se posponga el juicio para celebrarlo ante otro jurado según lo expuesto por la Regla 38 de Procedimiento Criminal vigente . . . ; tráigase al jurado.

[Regresa el jurado a la Sala]

¿Las partes aceptan que el Jurado es el mismo y está completo?

LCDO. GOGLAS:

Aceptado.

FISCAL RUIZ:

Aceptado, señor juez.

HON. JUEZ:

Bien, en vista de que el tribunal ha declarado con lugar la enmienda interpuesta por el representante del ministerio público, vista la no oposición del acusado a que con motivo de la resolución emitida por el tribunal se posponga el juicio para verse ante otro jurado, los señores del jurado están relevados de continuar interviniendo en este caso."

—III—

Comenzado por segunda vez el proceso el 14 de diciembre de 1966, la defensa hizo el planteamiento de doble exposición y solicitó la desestimación del mismo.

Infortunadamente, este incidente de desestimación fue visto ante otro magistrado y con la intervención de un distinto fiscal. Ninguno de los dos tenía la transcripción taquigráfica de los procedimientos anteriores, ni los conocían en la forma pormenorizada en que se revelan en la Parte II anterior. Ello motivó que la discusión versara primordialmente sobre la *primera* enmienda a la acusación en cuanto a quién de dos personas tenía el título *dominical* del vehículo, hecho éste que en las circunstancias del caso carecía de importancia además de que el acusado estuvo conforme en ese entonces conque se siguiera el proceso no obstante la enmienda; y no sobre el incidente de la *segunda* enmienda que produjo la disolución del jurado. La defensa ratificó su posición original al efecto de que debía archivarse el asunto bajo la Regla 38 (d) pár. 2, ante su criterio de que la segunda enmienda imputaba delito distinto. El juez recurrido rechazó la posición de la defensa y sostuvo que no se imputaba un delito *distinto* al originalmente imputado, sino que se trataba *del mismo delito de hurto.* (R. IV, págs. 2–14), y se negó a desestimar.

1. *Regla 144 (d)*

Bajo esta Regla no puede justificarse la disolución del jurado antes del veredicto ocurrida en este caso. Fue éste, en todo concepto, un juicio enteramente normal, sin incidente o error alguno que pusiera en duda la integridad del proceso o su imparcialidad. Compárense los hechos en *Piñero Agosto* v. *Tribunal Superior* y en *Pueblo* v. *Arteaga,* antes citados, y casos en ellos discutidos. En *Arteaga,* el magistrado concedió *sua sponte* un nuevo juicio ante un error o inobservancia de

la ley cometido por él que con razón creyó le era grandemente perjudicial al acusado. Sostuvimos la validez de este nuevo proceso.

Bajo la *Regla 144(d)* el récord demuestra la total ausencia de un estado de necesidad imperiosa, o siquiera de necesidad, que consagra la doctrina para justificar, en el uso de una sana discreción judicial, la disolución de un jurado antes del veredicto; discreción ésta que hay que pesarla y medirla contra la garantía constitucional de la exposición doble, justificada sólo por el otro deseable principio de mantener la integridad e imparcialidad del proceso judicial. Véanse ilustrativas exposiciones de la doctrina de la necesidad justificadora de la disolución de un jurado en medio de un proceso: *Carsey* v. *United States*, 392 F.2d 810 (D.C. Cir.), págs. 812–816; *Oelke* v. *United States*, 389 F.2d 668 (9th Cir.), págs. 670–672, *cert.* den. 390 U.S. 1029; *McKissick* v. *United States*, 379 F.2d 754 (5th Cir.), págs. 760–761; *Augenblick* v. *United States*, 377 F.2d 586 (Ct. Cl.), págs. 593–596 (véase *United States* v. *Augenblick*, 393 U.S. 348); *United States* v. *Burdick*, 284 F.Supp. 685, 687; *Brock* v. *North Carolina*, 344 U.S. 424; *Wade* v. *Hunter*, 336 U.S. 684; *State* v. *Malouf*, 287 S.W.2d 79 (Tenn.), págs. 81–82; *State* v. *Preto*, 144 A.2d 19 (N.J.), págs. 22–25, en donde se reafirma el principio de que la disolución de un jurado sin base o necesidad que lo justifique equivale a una absolución, y un segundo proceso viola la garantía contra ser doblemente expuesto. *State* v. *Romeo*, 181 A.2d 560 (N.J.), págs. 562–564.

Muchas de las expresiones en los casos citados responden al concepto menos exigente de la garantía antes de la reciente decisión de *Benton*. No obstante, la doctrina ha sido firme en el sentido de que debe haber una manifiesta necesidad en el récord que justifique la disolución del jurado para proteger la integridad del proceso y evitar frustraciones de la justicia.

Este Tribunal no se ha apartado de esa doctrina. En *Pueblo* v. *Arteaga*, ante, continuamos la cita, a la página 151: (93 D.P.R.)

"Puede decirse en síntesis de esas normas, que cuando ocurren circunstancias en que los fines de una justicia sustancial no puedan lograrse y *exista una manifiesta necesidad* de así hacerlo, de modo que no se derroten los mejores fines de la justicia, un juicio puede descontinuarse y disolverse el jurado sin el consentimiento del acusado o aun ante su objeción, sin que por ese solo hecho un segundo enjuiciamiento por el mismo delito quede al margen de la garantía constitucional. Es norma complementaria de lo anterior que la descontinuación de un juicio en esas circunstancias debe ser producto de una sana y juiciosa discreción; *la facultad debe ejercitarse con la mayor cautela, por consideraciones obvias de peso, y* ante una necesidad manifiesta de así hacerlo. [cita de autoridades]" (Énfasis puesto.)

Con la posición constitucional asumida en junio último por el Tribunal Supremo de Estados Unidos en el caso de *Maryland*, las anteriores expresiones tienen aún mayor virtualidad.

2. *Regla 38(d)*

Bajo la Regla 38(d) tampoco es sostenible la disolución del jurado y terminación del proceso antes del veredicto final.

Ante la petición de la defensa de absolución (*non-suit*) terminada toda la prueba de cargo, el tribunal había ya determinado en el curso ordinario del proceso que la misma era suficiente como cuestión de derecho, dentro de los hechos imputados en la acusación, para que el caso pasara al jurado. Fue de opinión que de la prueba desfilada el jurado podía inferir el valor de las piezas alegadamente hurtadas, a los efectos del grado del hurto. En esa determinación no había error. Véase: *Pueblo* v. *Gagot Mangual*, 96 D.P.R. 625 (1968), págs. 626–627.(7) De haber el jurado convicto al

---

(7) A la luz de todas las circunstancias en el récord, el jurado podía inferir que un motor completo de un automóvil, más los aros y sus gomas que la prueba señalaba como vendidos por el acusado, de creer esa prueba,

acusado, creída la prueba de cargo, difícilmente vemos cómo tal convicción hubiera sido revocada en apelación por esta razón de insuficiencia de prueba.

En segundo lugar, no había incongruencia entre la prueba de cargo desfilada y los hechos alegados en la acusación. La reseña en detalle de esa prueba, *Parte II*, demuestra palpablemente la ausencia de incongruencia alguna. No vemos la necesidad que tuviera el fiscal para enmendar la acusación por segunda vez, particularmente después del fallo a su favor negando la desestimación (*non-suit*). Véase: *Soto* v. *Tribunal Superior*, 90 D.P.R. 517 (1964), págs. 524–527.

La Regla 36 de Procedimiento Criminal expone que una acusación no será insuficiente ni se afectará el juicio u otro procedimiento basado en la misma, por imperfección *de forma* que no perjudicare los derechos del acusado. El juez aceptó la enmienda a la acusación bajo el criterio de que no imputaba delito distinto, y se negó a archivar definitivamente el proceso. Con tal criterio no vamos a intervenir ahora. En esas circunstancias, el mandato constitucional le obligaba a seguir el proceso, por otra parte enteramente normal, hasta su terminación. Bajo el mecanismo de la Regla 38(d) sólo podía disolverlo para comenzarlo por segunda vez con el *consentimiento* del acusado.

El incidente completo que produjo la disolución del jurado ha sido anteriormente transcrito. Es obvio que el acusado no dio su consentimiento a dicha disolución para otro proceso. Se opuso a la continuación del caso porque entendía que la enmienda imputaba un delito enteramente distinto y que debía ordenarse un archivo definitivo en ese momento. Se opuso, por igual razón, a que se terminara, para empezarlo otra vez. No sería propio sacar fuera de contexto y aislar una frase o expresión en el curso de una controvertida y

---

podían tener un valor de más de cien dólares, en ausencia de prueba en contrario de la defensa que tendiera a demostrar un valor menor o a destruir tal valor.

extensa discusión para concluir que el acusado consintió, contrario a lo que revela la transcripción completa del incidente.

Aun si hubiera duda sobre el particular, estando envuelta una garantía constitucional básica, tal *consentimiento* debe aparecer del récord de manera expresa, clara y explícita, que no deje lugar a dudas de que fue dado, como ocurre cuando se renuncia a las garantías constitucionales básicas. *Cf. Boykin* v. *Alabama*, 395 U.S. 165, res. junio 2, 1969; *Carnley* v. *Cochran*, 369 U.S. 506.

La disolución del jurado en este caso y la decisión sometiéndolo a un segundo proceso quebranta la Sec. 11 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico. Como se ha dicho, la garantía es contra ser puesto en riesgo más de una vez de ser castigado, no exige haber sido castigado. Al descontinuarse su juicio, el peticionario había sido puesto en riesgo de ser castigado en un proceso normal, bajo una acusación suficiente y en un tribunal con competencia.

Hasta aquí la ponencia originalmente circulada.

—IV—

Hay el criterio de que este caso se rige por *Ríos Mora* v. *Tribunal Superior*, resuelto en 28 de junio de 1967. Una de nuestras más sensitivas funciones en la aplicación de la norma de derecho es saber captar las diferencias en los hechos y en las circunstancias entre los casos. Individualizando cada caso en sus hechos y circunstancias es como se puede lograr la justicia de un caso determinado. Basta leer a *Ríos Mora*, publicado en 95 D.P.R., página 117, para que resalte la diferencia en hechos y circunstancias a los fines de la norma de derecho en él aplicada. Allí, una mayoría del Tribunal aplicó el derecho bajo el supuesto de que existía incongruencia básica entre aquella acusación y aquella prueba. En el caso presente hay ausencia total de incon-

gruencia, simple o fatal, entre los hechos imputados y alegados y los hechos probados por el ministerio público. La acusación imputó el hurto de piezas de automóvil, y el fiscal oportó prueba del hurto de piezas de automóvil.

Dije antes que no había necesidad alguna para la segunda enmienda a la acusación que motivó la disolución del jurado y esta controversia. La lectura en el récord del incidente sobre absolución (*non-suit*) terminada la prueba de cargo con la prolongada discusión que surgió, así como ciertas expresiones de incertidumbre por parte del magistrado en cuanto al derecho aplicable hechas en el curso de la misma, no obstante fallar a favor del ministerio público, me crean la certeza moral que la razón de la enmienda fue el temor del fiscal de que el jurado no hallara probado como cuestión de hecho, en ausencia de prueba directa, el valor por sobre cien dólares de las piezas hurtadas. De ahí el cambio deseado para imputar el hurto del automóvil, sobre el cual habían expresiones de su valor.

Una de las prácticas más dañinas y deteriorantes de la naturaleza del proceso judicial es que se utilice el mecanismo de disolución del jurado de las Reglas 38 y 144 para obviar o salvar deficiencias del proceso por parte del ministerio público, o para obviar o salvar deficiencias del proceso por parte de la defensa, por igual. Pero en el caso primero, la práctica sería aun más censurable, por cuanto bajo nuestro sistema procesal el ministerio público viene obligado a probar el delito, y al acusado le acompaña una presunción, aquí constitucional, de inocencia.

Ahí descansa, precisamente, la filosofía y naturaleza de esta garantía constitucional, que ahora forma parte del debido procedimiento, contra el *exponer* al ciudadano más de una vez al rigor de un proceso, y prohíbe que el Estado moleste al ciudadano con sucesivos procesos no eficientes o fallidos hasta llegar a uno perfecto que conduzca a su convicción.

Conscientes de la importancia de esta garantía constitu-

cional, las Cortes han interpretado disposiciones como nuestra Regla 144 (d) siempre de la manera más restrictiva contra la terminación del proceso antes de veredicto, y cuando lo han sancionado, sólo por razón de proteger otras garantías constitucionales, como es la pureza de un juicio justo e imparcial, piedra angular ésta del debido procedimiento de ley.

Consciente también el legislador de esta garantía constitucional, exigió en la Regla 38 (d) que el acusado prestara su *consentimiento* para la disolución de un jurado antes del veredicto.

Puede ser trágico para un pueblo el que no existan legisladas garantías constitucionales para sus ciudadanos. Más trágico aun sería que existan sin plena vigencia y efectividad, como piezas de exhibición demostrativas sólo de lo que una sociedad ha sido capaz de concebir ideológicamente.

Me explico que en la aplicación de las normas de derecho haya discrepancias de criterio. Sostener, después de lo que revela la extensa discusión en el récord sobre el incidente de disolución del jurado que he transcrito íntegramente sin omitir parte alguna, que el acusado y su defensor consintieron a dicha disolución y para ser vuelto a enjuiciar, y que hubo el consentimiento que exige la Regla 38 (d) de manera clara y sin lugar a dudas, según exige la norma de derecho cuando se renuncia a una garantía constitucional, eso no me lo explico.

En vista de la disposición de este recurso, en que el peticionario será sometido a juicio en el Tribunal Superior bajo acusación del hurto de un automóvil, me abstengo deliberadamente de hacer conclusión alguna sobre la procedencia del proceso sin que antes un magistrado hubiera determinado causa probable contra el peticionario por el hurto de ese vehículo.—Reglas 24 (c) y 64 (p) de Procedimiento Criminal.